Filed 2/23/15  In re Aiden R. CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Plumas)

----

| | |
|---|---|
| In re AIDEN R. et al., Persons Coming Under the Juvenile Court Law. | |
| PLUMAS COUNTY DEPARTMENT OF SOCIAL SERVICES AND PUBLIC GUARDIAN,<br><br>        Plaintiff and Respondent,<br><br>    v.<br><br>M.R.,<br><br>        Defendant and Appellant. | C075014<br><br>(Super. Ct. Nos. JV1300024, JV1300025) |

M.R. (mother) appeals following the juvenile court's dispositional orders that removed minors Aidan R. and Jayden R. from her custody.  (Welf. & Inst. Code, § 395.)[1] Mother contends (1) there is insufficient evidence to support jurisdiction and (2) the juvenile court erred by failing to order in-person visitation and delegating discretion for

---

[1]     Undesignated statutory references are to the Welfare and Institutions Code.

1

visitation to the minors' therapists. We conclude substantial evidence supports the jurisdictional findings and there was no error in the visitation order. Accordingly, we affirm the juvenile court's orders.

FACTUAL AND PROCEDURAL BACKGROUND

### *Section 300 Petitions*

On May 3, 2013, mother was arrested, and eight-year-old Aidan and seven-year-old Jayden were detained by Plumas County Department of Social Services (the department). On May 7, 2013, the department filed petitions alleging the minors fell within section 300, subdivision (b), on the following grounds:

"b-1: On or about May 3, 2013, [mother], while under the influence of [m]ethamphetamine[], drove to the Plumas County Sheriff's Department, Portola Substation and engaged in a physical confrontation with Plumas County Deputy, Andrea Murana. [Mother] was subsequently arrested for a violation of Section 69 of the Penal Code: Resisting Arrest through the Use of Force; Section 23153(a) of the California Vehicle Code; Driving Under the Influence; and . . . Section 11550 of the Health and Safety Code: Under the Influence of a Controlled Substance. At that time, [mother] had care custody and control of her two minor children and was on her way to pick them up from day care while under the influence of [m]ethamphetamine. [Mother]'s use of illegal controlled substances while responsible for the care of her minor children places the children at substantial risk.

"b-2: On May 3, 2013, Charlene [C., mother's grandmother], stated she had concerns for the safety of her great-grandchildren, Aidan and Jayden [Charlene C.] stated to [Deputy] Murana that [mother] confessed to her that she was using [m]ethamphetamine and 'selling her body for drugs.' [Charlene C.] feared for the children's safety because [mother] drives while under the influence of drugs. [Charlene

2

C.] stated [mother] does not take her medications as prescribed and she 'self medicates' with [m]ethamphetamine."

### *Jurisdiction Report*

The jurisdiction report, filed May 13, 2013, alleged four prior referrals to Child Protective Services (CPS) in Plumas County and a prior child endangerment charge against mother in Washoe County, Nevada. The most recent referral, which alleged mother's home was filthy, she had no food or electricity, and she was selling her food stamps, was open for investigation at the time of her arrest.

The sheriff's report on mother's arrest stated mother told Deputy Murana she was on her way to pick up the minors from day care. The urine sample she voluntarily provided tested presumptively positive for methamphetamine. She told Deputy Murana she injected and smoked methamphetamine several days a week. Deputy Murana observed dozens of injection sites on the insides of mother's elbows.

Mother had sustained a Nevada child endangerment conviction and two convictions for driving under the influence of alcohol.

The alleged father said he would like to pick the minors up, but had made no further contact with the department.[2]

Mother wanted help from the department to pay her electricity bills. She said the minors were all she had. She claimed she did not need to use drugs.

### *Addendum Report*

An addendum report filed May 29, 2013, stated the minors were placed with the maternal great-grandparents. Mother had missed three out of six scheduled supervised visits, claiming conflicting temporary employment and transportation problems.

---

[2] The alleged father is not a party to this appeal.

3

A written statement by the maternal grandmother and the maternal great-grandmother alleged:

Mother had struggled with mental health problems for most of her life. At age 13 she was diagnosed as bipolar (which she denied); at some time, she was diagnosed as suffering from borderline personality disorder. Also at 13, she started using drugs and was admitted to a hospital due to self-cutting and outbursts of rage. She had lived with various family members, but was always asked to leave because she caused great disorder and conflict. When she was 15, the family heard she was prostituting herself, although they had no proof. She once totaled the family truck while drunk. She married a known drug dealer. She went to jail for cashing fraudulent checks and for drug offenses. Her children had gone to foster care three times in the past. She had used violence against her ex-husband and the maternal great-grandmother. She once called the police because she thought someone was watching her; they jailed her for drug use. She once slapped one of her sons so hard it was as if he had been knocked out. She had left the children in the car while she gambled. She was so disrespectful and ungrateful to the maternal grandmother and great-grandmother that they had asked her not to come to their house anymore. She had become irrationally obsessed with the notion someone had stolen her identity. Until she received the help she needed, the maternal great-grandparents were willing to care for the minors.

### *Amended Section 300 Petitions*

On July 2, 2013, the department filed amended petitions adding the following allegations under section 300, subdivisions (a) and (b) as to Aidan and under subdivision (j) as to Jayden:

"On or about June 26, 2013, Visitation Supervisor Nikki Hall witnessed during the Supervised Visitation that [mother] had become angry with her son, Aidan R, for hesitating to come near her when she called to him. In response to his behavior, [mother]

4

grabbed Aidan's arm with her hand, and attempted to pull Aidan to a nearby bench. As she got closer to the bench, she moved her hand to the back of his neck to move him toward the bench. Aidan cried and rubbed his neck after [mother] had removed her hand. There were red bruise marks left by [mother]'s fingers on Aidan's neck. Such nonaccidental injury places the child at risk of serious harm or injury.

"On or about June 26, 2013, after Aidan R's mother . . . grabbed her son by the neck, causing him to cry and leaving marks where her fingers had been, [mother] responded to his crying and rubbing his neck by stating, 'You deserve worse than me grabbing you!' "

### *Amended Jurisdiction Report*

On July 12, 2013, the department filed an amended jurisdiction report, citing the new section 300 allegations. The report attached a sheriff's report on the June 26 incident and the statement of visitation supervisor Nichole Hall. It recommended continued placement of the minors with the maternal great-grandparents.

The sheriff's report stated that according to Hall, the visit began in a public library because mother thought it was too hot to go to the park across the street, even though the minors wanted to play there. Mother, who was visibly irritable and frustrated throughout the visit, caused a "scene" at the library. Her demeanor alternated between lack of interest in the minors and aggression toward them; the minors seemed "fearful" of mother and would flinch when she approached them quickly. Mother was asked to leave the library because of her "boisterous" behavior. The rest of the visit took place at the park. Hall saw mother grab Aidan by the arm and force him toward a park bench, then grab him by the neck halfway to the bench; when he cried and rubbed his neck, she said: "You deserve worse than me grabbing you." Thirty minutes before the visit was supposed to end, mother said: "Take them home, I'm done." Aidan complained to Hall about pain on the back of his neck; she found redness and swelling. She photographed

the injuries and reported the incident to the social worker. The investigating deputy inspected the photographs and saw redness and/or bruising consistent with the minor being forcibly grabbed by the back of the neck. Contacted at his foster home, Aidan said mother regularly grabbed him and he was "used to it." Mother admitted to the deputy that she grabbed Aidan by the neck, but did not think it was forceful enough to cause an injury; her children "mark or bruise easily." The deputy forwarded the results of the investigation to the Plumas County District Attorney for a possible charge of inflicting injury on a child.

Hall's written statement was consistent with the deputy's account of her oral statement. In addition, Hall noted mother talked negatively about the maternal great-grandmother in front of the minors and made the minors "feel as though they are to blame." Aidan said he was used to mother grabbing him because "she does it all the time."

## *Contested Jurisdiction Hearing*

The juvenile court held a contested jurisdiction hearing on August 1, 2013.

### *Evidence*

**1. Plumas County Sheriff's Deputy**

Plumas County Sheriff's Deputy Murana testified that sometime before May 3, 2013, mother called to request an "identity theft packet" (documents the sheriff's office issues to help identity theft victims). Around 2:30 p.m. on May 3, she drove to the substation to pick it up.

Deputy Murana noticed clear physical signs that mother was under the influence of methamphetamine. They did not resemble the signs of attention deficit disorder (ADD) or attention deficit hyperactivity disorder (ADHD).

Deputy Murana revealed her suspicion to mother, who became considerably more agitated. Mother said she was going to pick up her children. Murana said she wanted to

6

administer field sobriety tests.  After claiming she was taking a lot of prescription medications, mother tried to leave.

Deputy Murana tried to detain mother, but she resisted and a physical altercation ensued.  Murana called dispatch for assistance; Deputy Steven Waasdorp responded.[3]  After Murana threatened to use her Taser, mother stopped resisting.

While detained, mother told Deputy Murana about physical problems for which she took prescription medication, including "amphetamine salts," oxycodone, Cymbalta, and Levothyroxine.  Murana did not administer field sobriety tests because mother requested a lawyer.

Deputy Murana arrested mother, then took her to the hospital because she was complaining of pain from the altercation.  Mother gave a urine sample.  She admitted injecting methamphetamine several times a week.  Murana saw injection marks on the insides of mother's elbows.  Mother said she had "shared a needle with" a man named Dale T., which Murana took to mean in the course of using methamphetamine.  Mother asked something similar to:  "Isn't meth supposed to take away pain?"

Deputy Murana was later called to investigate the June 26, 2013, incident.  Photographs of Aidan's neck showed injuries consistent with being grabbed by a hand.  Aidan told Murana he was used to mother grabbing him.

### 2.  Maternal Great-Grandmother

Charlene C., the maternal great-grandmother, testified that in May 2013, when mother was living in Portola with the minors, she had problems paying for electricity at her home.  The minors began sleeping overnight at Charlene C.'s house.  She would take

---

[3]     Deputy Waasdorp testified that when he arrived at the substation, Deputy Murana had already handcuffed mother, who was combative and crying.  She said she took prescription medications, possibly including Oxycontin, for various physical problems.

them to school and a school bus would take them to day care in the mid-afternoon. Mother was supposed to pick them up from day care on May 3. In October 2012, mother admitted she had been using methamphetamine, but they had not discussed the subject further, and Charlene C. believed mother would not use again.

Around 1:30 or 2:00 p.m. on May 3, mother drove to Charlene C.'s workplace, appearing "[d]istraught and disheveled." Mother wanted Charlene C. to tear up a document that appointed Charlene C. and her husband as the minors' guardians if anything happened to mother. When Charlene C. refused, mother became extremely upset and angry, and said Charlene C. would "never see these kids again." Mother then drove off "[e]rratically and dangerously."

Charlene C. did not call the police because she thought mother would calm down. In any event, Charlene C. thought there was nothing else she could have done at that point without a court order giving the great-grandparents custody rights.

Charlene C. stated she and the minors had a loving relationship and they would confide in her. They had told her they were concerned that they could not see mother. Aidan was also concerned about mother's well-being and whether she could "get the things fixed that need to be fixed [so they] could become a family again."

Charlene C. had once seen mother strike Jayden so hard "he fell dead flat on the ground."

### 3. Visitation Supervisor

Visitation supervisor Nichole Hall testified that on June 26, 2013, because mother could not quiet the minors at the library, she decided to end the visit early. When the minors started to cry, she said they could go to the park and play on the swings before they left. They did so, but still seemed "a little closed off." Aidan walked away. When he refused to return to mother, she went to him and grabbed him by the arm. She told him he was in trouble and needed to go sit on the bench. Halfway there, she switched

8

hands, grabbed him on the back of the neck, and took him to the bench that way, telling him he was in time-out. He started crying. She told him: "You deserve worse than me just grabbing you." Hall took photographs of Aidan's neck at the great-grandparents' house, but did not take him to a doctor.

### 4. Mother

Mother testified that the minors began staying with the great-grandparents around April 27, 2013, at mother's request after she lost electricity at her apartment. She was staying in Reno and working part-time. She was scheduled to work on May 3. On that date she returned to Portola around 1:15 p.m. and went to Charlene C.'s workplace, hoping for financial help, but Charlene C. refused and they argued about money. They did not discuss picking the minors up from day care; Charlene C. was expected to do that because mother could not do it under the circumstances.

Mother left for work. On her way, she stopped at the Portola sheriff's substation to get an identity theft packet; she thought she could go right in and out. Since she had not seen her children and was running late for work, she was already a little upset. After Deputy Murana went to hand her the packet, mother started crying.

As of May 3, mother was taking "quite a few" medications, including amphetamine salts for ADHD, Gabapentin for trouble with a nerve in her back, Levothyroxine for thyroid problems, oxycodone for sleep and pain relief, and Cymbalta for "antidepression anxiety."[4] She also took nonnarcotic over-the-counter pain medications. On May 3, she had taken all her prescribed medications other than Gabapentin and Clonazepam.

---

[4] Mother's Exhibit A, a list of prescriptions she had picked up from the pharmacy, was offered in evidence.

Deputy Murana repeatedly said she was detaining mother, but would not explain why; therefore mother, feeling "trapped" and "scared," announced she was leaving because she needed to get to work. Mother never said she was picking up the minors from day care.

Deputy Murana stepped in front of her and they bumped shoulders. Murana accused mother of being under the influence of a narcotic. Mother reminded Murana that she had taken medications and had given her a list of them, and said she did not understand why Murana was holding her. Murana demanded mother take field sobriety tests; mother refused, but said she would perform a breath test or give a urine sample. Saying mother was resisting arrest, Murana hit her in the face, grabbed her by the hair, and threw her to the floor. Mother never touched Murana. If she flailed or kicked out, it was because she lost her balance.

Deputy Murana threatened to Tase mother. At that moment, Deputy Waasdorp came in. He helped her get up and sat her down.

After being arrested and taken to the hospital, mother gave a urine sample. She did not discuss her drug use with Deputy Murana there. She never told Murana she used methamphetamine several times a week. She did not have fresh injection sites on the insides of her elbows, and Murana never looked at her elbows. Because Murana claimed she had suffered a scratch during the altercation and asked if she had to "worry about anything," mother said she had slept with Dale T. but did not know if he "had anything"; she said she did not use needles and was "clean" as far as she knew. Mother never said, "Isn't meth supposed to take away your pain?"

Mother never told Charlene C. she was prostituting herself. Mother told her about using drugs, but that was over eight years ago. Mother was diagnosed as bipolar at age 14, but it was a misdiagnosis: she was actually suffering trauma from an undisclosed

rape by five men. After she disclosed the rape a year later, she was diagnosed with posttraumatic stress disorder (PTSD). She was diagnosed with ADHD in 2011.

On June 26, 2013, mother's visit with the minors began at the park, but after 20 minutes it got too hot, so they went to the library. Aidan was very tired because he had been up all night playing video games with the maternal great-grandfather. Mother had to keep reminding the minors to be quiet. Jayden got upset and angry and started to throw a fit. Mother said the visit should end, because she had been told if children are not behaving during a visit they need to go home. The minors started to cry. The group left the library and went outside. Mother reiterated that she did not want the minors staying up to play video games, then kissed them good-bye. She had not had any visits with the minors since that day.

Mother and the minors did not go to the park after leaving the library. Mother never grabbed Aidan by the neck. She never told either minor that he deserved "worse than me grabbing you." She never said: "Take them home. I'm done." She did not see marks on either minor when she left them that day. She told a sheriff's deputy she had touched Jayden on the shoulder but not strongly enough to cause injury; she never told the deputy anything about Aidan.

Mother had never hit Jayden in the maternal great-grandmother's presence.

### *The Juvenile Court's Ruling*

After hearing argument, the juvenile court found as follows:

"You know, if we parse all the facts here, each one by itself [there] may not be enough to sustain all these [p]etitions. But if you look at a continuum of behavior from May through June and you look at her criminal record and statements by the [maternal great-grandmother], the sense -- and I'll come back and I'll deal with this, but I just don't feel comfortable saying these charges are not true and giving these children back to this mother, who . . . appears to have -- there's really not a lot of testimony in terms of mental

11

health, but who appears to be taking a lot of medications that are usually used for treating people who have certain types of mental health issues, but more importantly, appears to have a substance abuse problem in terms [of] methamphetamine.

"Officer Murana basically says, 'I saw her track marks on her elbows. She admitted she was using it, and the instant test was positive for methamphetamine.'

"The thing that bothers me most . . . is that if you ask Andrea Murana, Steve Waasdorp, the deputies, you ask her grandmother, Charlene [C.], they all saw different incidents at different dates, and their testimony was, 'This is what happened.'

"[Mother] takes the stand and says these things never happened. It wasn't that it did happen, it wasn't the yeah-but defense: [']I-did-it-but.['] It wasn't that the child had a bruise on his neck. 'I overreacted.' 'I shouldn't have done it,' or, 'The child bruises easily,' or something like that. It's that it didn't happen. The same thing with the incident in the substation: It wasn't her fault. She wasn't under the influence of methamphetamine. It was [Deputy] Murana's fault, not hers.

"You put that whole thing together and you have someone in total denial. And then you want me to give these children back to this parent. I have a problem with that.

". . . I tend to agree with [mother's counsel] in most circumstances that normal discipline by a parent that leads to certain types of traumatic injury in and of itself may not be enough to sustain a petition. I understand what you're saying, but taking this case with all the facts there and the [maternal great-grandmother]'s testimony that this woman has hit these children before and basically hurt the other child at one point, I think you put the whole thing together and it's not just one isolated incident where the parent made a simple mistake.

". . . Most of us are parents I guess, and we've had days that are some days are better than others, and sometimes you . . . overreact I would think. But there is a fine line

12

between giving a child one extra pat on the butt as opposed to traumatic injury. So I just have a lot of problems with that."

The juvenile court struck the allegation that mother was "[s]elling her body for drugs" and found the remaining allegations of the amended section 300 petition true. The court found the maternal great-grandparents were suitable persons to care for the minors. The court suspended visitation pending further order of the court. The court ordered mother to submit to a mental health assessment. Finally, the court set a disposition hearing for August 12, 2013.

### Disposition Report

The disposition report recommended continued foster placement, with reunification services for the parents.

The report stated Aidan and Jayden had been removed from mother's custody and made dependents of the juvenile court in Nevada (in Aidan's case more than once) due to mother's substance abuse, domestic violence, physical abuse (grabbing Aidan around the neck hard enough to cause bruises), and mental health problems. The latest Nevada dependency proceeding was terminated in April 2011. However, after that date there were multiple CPS referrals in Nevada and California.

Mother claimed she took amphetamine salts by prescription for ADHD, but did not allege any other disability. She did not accept her diagnosis of bipolar disorder.

Mother claimed her past driving under the influence (DUI) charges were unfounded. She also claimed she was put on probation at 14 due to a false charge of assault made by Charlene C., and Charlene C. assaulted her shortly after she gave birth to Aidan.

Mother claimed her family habitually "made up shit" to try to get the minors removed from her custody. She felt they did not think she could ever become a normal

13

human being and always thought she was doing drugs. She did not like her family or being around them. She believed the maternal great-grandfather was prone to violence.

Mother called her childhood "chaotic," with frequent moves and domestic violence between her parents, who divorced when she was two years old; her father was later incarcerated. Both parents abused drugs and alcohol in the home. As a result, she often resided with her maternal or paternal grandparents.

Mother reported she first used drugs and alcohol at age 14, while with her boyfriend. He and his friends then raped her. After that, she developed habits of drinking heavily and using methamphetamine "on and off." These habits caused her to be hospitalized a few times during her teens.

Mother's marriage to Edward R. was "plagued by domestic violence." She claimed that at the time of Aidan's birth she had a broken hand due to domestic violence, and the hospital staff would not let her hold Aidan or see him for five days, which prevented him from bonding with her then.

Mother presented as highly intelligent and claimed a wide range of job skills and experience, but said she had recently been unable to work due to extreme back pain. She had succeeded in drug rehabilitation in Nevada and had reunified with the minors as a result. She loved the minors and wanted them back in her care.

Mother was willing to participate in parenting classes, psychological evaluation, and therapy. She was also willing to do drug testing, but feared amphetamine salts might produce a false positive for methamphetamine. She was not willing to participate in a drug and alcohol assessment, however, "because talking about drugs makes her want to go out and use."

Jayden had been diagnosed with reactive attachment disorder, according to mother and Charlene C. According to mother, he was also diagnosed at age five with oppositional defiant disorder. However, according to Charlene C., he had a closer

14

relationship with mother than did Aidan, who was out of mother's custody when Jayden was born.

On July 25, 2013, the social worker interviewed the minors and Charlene C. Aidan said he was doing well. Jayden was reluctant to answer the social worker's questions, but stated he wanted to see mother. Charlene C. stated both minors were doing well; Jayden "ha[d] been better about not stealing" and his tantrums had been calming down.

Both minors were on track developmentally for their ages. Aidan got good grades, but Jayden would have to repeat first grade because of reading difficulty.

The maternal great-grandparents were interested in being a concurrent home for the minors. If reunification proved unsuccessful, the department would make a referral for an adoption assessment.

### *Further Proceedings*

On August 12, 2013, the juvenile court continued the disposition hearing to September 9, 2013, because the department had not yet received the results of mother's court-ordered psychological evaluation. The court ruled mother could communicate with the minors by letter, provided the correspondence was screened by the social worker; however, the court would grant mother's request for telephonic visitation only if the psychological evaluator indicated it would be in the minors' best interest.

The juvenile court continued the disposition hearing several times until it was held on October 2, 2013.

### *Psychological Evaluation*

The psychological evaluation by Laura Morrison, Ph.D., performed August 8, 2013, was provided to the juvenile court as an attachment to an addendum report filed September 9, 2013.

15

Dr. Morrison was asked to answer six questions: (1) whether mother suffered from an emotional or psychiatric disorder, and if so, what was the most accurate diagnosis; (2) whether mother had a disorder that significantly interfered with her parenting skills and ability; (3) whether mother had tendencies toward violence that could endanger the minors; (4) whether a safe reunification plan for mother and the minors was possible; (5) what approaches would help to make a reunification plan more workable for mother; and (6) what kinds of services would help mother to have safe visitation with the minors. Dr. Morrison answered as follows:

(1) Mother's interview and testing strongly suggested several emotional disorders. The strongest indications were for PTSD, but borderline personality disorder and bipolar disorder might also be present, and there could be residual symptoms of reactive attachment disorder from a disruption in childhood bonding. Mother's medication precluded testing for ADHD. The aftereffects of drug use, among other things, made it unclear whether mother had bipolar disorder.

(2) Mother's symptoms significantly interfered with her parenting ability. Her emotional reactivity could make her very angry when her children misbehaved. Her hypervigilance made her likely to react very defensively to anything the minors did that felt like a threat to her, especially if it made her feel like a bad mother. She appeared to have an unusually strong need to control other people's behaviors, especially the minors' behaviors, which could lead to increased conflict with the minors. Drug use, including the overuse of prescription drugs, could make her far more reactive and emotional.

(3) Mother was more likely to react to an upsetting situation with physical force than other parents, due to her emotional reactivity, the physical violence in her family during childhood, and her involvement in aggressive sports during adolescence. There was a risk of physical violence toward the minors in her current emotional state. On the other hand, she recognized such conduct was not acceptable, and if she could improve her

16

self-control and reduce her need to control others, the risk of violence would be significantly reduced.

(4) Mother could follow through with a reunification plan. She had considerable intelligence, strong verbal skills, creativity, and a drive to achieve and to better herself; she cared for the minors and wanted the best for them; and she apparently did well in a previous reunification plan. But her oppositional behavior, her strong reaction against being told what to do, and her hypervigilance could make it difficult for her to work with and trust agency professionals. If therapy triggered feelings of vulnerability, she was likely to respond by acting "tough" and challenging whatever people said to her.

(5) Individual therapy would be crucial, even though she had said she did not want to go through it again. She needed to decide whether she really wanted to reunify with the minors, even though it would mean following orders from the juvenile court and the agency and making painful changes. In the past she cooperated with reunification because she recognized she had abused drugs, but this time she seemed to hope the court would see the allegations against her were unfair and leave her alone.

She needed to learn basic skills through therapy: self-control, calmness, taking responsibility for her behavior, and feeling safe without needing to control others' behavior. Her difficulty with trust would need to be addressed early in therapy.

(6) If the minors were in therapy, mother's next visitations with them should be in the context of a family therapy session (provided the therapist felt it would benefit the minors). Supervised visitation outside family therapy should occur when the therapist believed the minors were ready for it.

CPS staff should give mother clear and specific guidelines about what kinds of touching, and what kinds of behaviors and discipline generally, are appropriate during a supervised visit.

Finally, mother needed to admit honestly what had happened in her relationship with the minors and to validate their feelings about it. She might need to work with her therapist on her defensiveness and the emotional pain she felt about parenting before she could take this step.

### *Addendum Report*

Based on Dr. Morrison's report, the department recommended mother's case plan should require both individual therapy and family therapy with the minors (at the discretion of her therapist and the minors' therapist). The department also recommended drug screening three times a week and a drug and alcohol assessment.

The report's recommended orders included: "Visitation shall remain suspended, pending discretion of the children's therapist, that Visitation should be resumed in the form of Family Therapy Sessions."

### *Contested Disposition Hearing*

The juvenile court held the contested disposition hearing on October 2, 2013. The court received mother's "documents in response to disposition report and addendum report" in evidence, along with a certificate of graduation from a "parenting life skills class" and a drug test dated August 23, 2013.

Mother's counsel made an offer of proof that she had enrolled in a parenting class, had set up a psychiatric appointment for the next day to review her prior diagnoses of ADHD and PTSD, and had been requested to take a monthly drug test at Eastern Plumas Health Care. The first results in that series showed mother tested positive for amphetamine due to Adderall.

Mother's counsel stated mother had sent cards and letters to the minors with the approval of the department and the minors' counsel, and had engaged in supervised telephonic visits for the last two weeks without any problems. Counsel requested the juvenile court "at the very least . . . move forward as far as visitation is concerned" and

18

make sure that "whatever is necessary as far as a therapist or that sort of thing for the children, or joint[ly with mother] is set in place today."

The juvenile court asked what Dr. Morrison recommended as to visitation. Mother's counsel replied: "[B]asically she left it up to the therapist, which obviously we have a concern with." The court agreed it could not "delegat[e] the Court's authority to someone else to determine what visitation should be."

Asserting mother had a stable residence, had paid all her bills through the end of the year, had gotten her car back, was doing well in school, had begun drug testing, and had done what was required of her in terms of her mental health evaluation and her prescriptions, counsel requested the minors be returned to her, or alternatively that the juvenile court address her concerns about the current placement.

The minors' counsel agreed with the department that visitation needed to be done in the context of family therapy.

County counsel asserted mother had refused to do drug testing as recommended by the department. Instead, she had tried to control the situation by choosing a different doctor and laboratory, "which doesn't have a great reputation."

County counsel asserted further that mother had not taken the steps needed to conduct a safe and successful visitation. She had not yet honestly admitted what had happened in her relationship with the minors. At the jurisdiction hearing, she had denied injuring Aidan. Since then, she had presented no new information to show supervised visitation would be safe.

The juvenile court ruled mother would continue to receive card, letter, and telephone visitation. At the review hearing in six weeks, the court wanted to hear from the family therapist "and all the medical things." If matters were going well, the court would entertain a motion from mother to receive physical visitation.

19

DISCUSSION

I

*Sufficiency of the Evidence*

Mother contends the evidence was insufficient to support the juvenile court's jurisdiction order under either subdivision (a) or subdivision (b) of section 300.[5] We disagree.

The juvenile court has grounds for jurisdiction if the actions of either parent bring the minors within any of the statutory definitions in section 300. (*In re Joshua G.* (2005) 129 Cal.App.4th 189, 202.)

Section 300, subdivision (a), provides that the juvenile court has jurisdiction if "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm inflicted nonaccidentally upon the child by the child's parent . . . . For the purposes of this subdivision, a court may find there is a substantial risk of serious future injury based on the manner in which a less serious injury was inflicted, a history of repeated inflictions of injuries on the child or the child's siblings, or a combination of these and other actions by the parent . . . which indicate the child is at risk of serious physical harm." Under this provision "[t]he court may consider past events in deciding whether the child presently needs the court's protection. [Citations.]" (*In re N.M.* (2011) 197 Cal.App.4th 159, 165.)

"Section 300, subdivision (b) provides a basis for juvenile court jurisdiction if the child has suffered, or there is a substantial risk the child will suffer, serious physical harm or illness caused by the parent's inability to provide regular care for the child because of

---

**5** Mother makes no argument as to subdivision (j), under which her conduct toward Aidan was alleged as showing a risk of physical harm to Jayden. Thus, mother impliedly concedes that if substantial evidence supports jurisdiction under subdivision (a) or (b), it does so under subdivision (j) as well.

the parent's mental illness . . . or substance abuse.  A jurisdictional finding under section 300, subdivision (b), requires:  ' "(1) neglectful conduct by the parent in one of the specified forms; (2) causation; and (3) 'serious physical harm or illness' to the child, or a 'substantial risk' of such harm or illness." [Citation.]'  [Citations.]  The third element 'effectively requires a showing that at the time of the jurisdictional hearing the child is at substantial risk of serious physical harm in the future . . . .  [Citation.]" (*In re James R.* (2009) 176 Cal.App.4th 129, 135.)

"Evidence of past conduct, without more, is insufficient to support a jurisdictional finding under section 300.  There must be some reason beyond mere speculation to believe the alleged conduct will recur.  [Citation.]" (*In re James R., supra*, 176 Cal.App.4th at p. 136.)

We review a challenge to the sufficiency of the evidence to support a jurisdictional finding under the substantial evidence standard, resolving all evidentiary disputes in favor of the court's rulings and drawing all reasonable inferences to support them.  (*In re Alexis E.* (2009) 171 Cal.App.4th 438, 450-451.)  "Weighing evidence, assessing credibility, and resolving conflicts in evidence and in the inferences to be drawn from evidence are the domain of the trial court, not the reviewing court." (*Id.* at p. 451.)

The juvenile court found the minors were at substantial risk of serious physical harm in mother's care because (1) she suffered from mental health problems and methamphetamine abuse; (2) both minors had already suffered traumatic injury at mother's hands; and (3) mother was in "total denial," contradicting all other witnesses and portraying herself as blameless in every instance.  The court considered the continuum of behavior from May through June and mother's mental health and drug problems to find that mother had endangered the minors and created a substantial risk of doing so in the future.  Substantial evidence supported these findings, which justified jurisdiction under both subdivision (a) and subdivision (b) of section 300 (and by

21

extension, also under subdivision (j) as to Jayden).  We cannot reweigh the juvenile court's finding that mother's contrary account was not credible.

Mother asserts the evidence was insufficient under subdivision (a) as to Aidan because (1) visitation supervisor Hall did not stop mother from grabbing him by the neck; (2) Hall apparently said nothing to mother while the incident was happening; (3) Hall confirmed mother's claim that Aidan had been acting out; (4) Hall did not take Aidan for medical treatment and opined that the marks on his neck did not require it and were not serious; (5) Aidan told the investigating deputy mother did "it" all the time and he was "used to it"; (6) Hall had seen mother appropriately use time-outs and counting as discipline; (7) mother grabbed Aidan and took him to the bench for a time-out in response to his disobedience; (8) Hall did not notice the marks on Aidan's neck until she returned the minors to the great-grandmother's house; and (9) mother said she saw no marks on either minor during the visit.  Mother's summary of the evidence is selective, not supported by the record, and does not negate the evidence before the juvenile court.

The evidence did not show whether Hall was in a position to stop mother from grabbing Aidan, or whether it would have been within a visitation supervisor's protocol to do so.  Mother's assertion that Hall "confirmed that Aidan had been acting out" is not supported by the record:  at the page mother cites, Hall described Aidan's behavior neutrally, without using the words "acting out" or anything similar.  In any case, whether Aidan was misbehaving before the incident occurred does not justify mother's nonaccidental infliction of serious physical harm on him.  Whether mother used appropriate discipline at other times does not negate the facts before the juvenile court.

Although Hall did not take Aidan to a doctor, it is not true that she said his injury was "not serious."  At the page mother cites, Hall said she had not called the injury "severe," but she "felt it was something worth taking photographs of and that it could

22

have potentially bruised," which indicates Hall thought it *was* serious. When Hall first noticed the marks on Aidan's neck does not negate the serious nature of the bruising.

Mother's claim that she never saw any marks on either minor does not negate the evidence that there were marks on Aidan's neck. Furthermore, mother testified she did not grab his neck at all -- a claim that contradicted not only Hall's testimony and the photographs, but mother's own admission to the investigating deputy.

Finally, the fact Aidan told the deputy mother did "it" all the time and he was "used to it," is far from exonerating mother. It is strong evidence she was in the habit of nonaccidentally inflicting physical injury on Aidan and would likely do so in the future if allowed to retain custody.

Mother also misrepresents Dr. Morrison's evaluation as evidence against the juvenile court's finding under section 300, subdivision (a). It is true, as mother says, Dr. Morrison found mother did not believe it was acceptable to use physical force on the minors. However, in the very same paragraph Dr. Morrison also opined: "[A]s a result of the physical violence in her family during childhood and her emphasis on aggressive sports during adolescence, [*mother*] *is perhaps more likely to react to an upsetting situation with the use of physical force than another parent might. In her current emotional state, there is a risk that she could be physically violent toward her children*." (Italics added.) Mother ignores this opinion.

Lastly, mother attacks the juvenile court's reliance on the evidence of her violence toward Jayden.[6] Her arguments lack merit.

As mentioned above, the maternal great-grandmother testified she saw mother hit Jayden so hard he fell to the floor; mother testified this did not happen. Mother asserts

---

[6] Although this incident was not alleged in the section 300 petition, it was relevant to the juvenile court's determination of the risk to both minors.

23

the great-grandmother's testimony was highly prejudicial hearsay and inadmissibly offered as propensity evidence.  (Evid. Code, § 1101, subd. (b).)  Mother is mistaken.

The testimony was not hearsay because it was offered in court and the great-grandmother was available to be cross-examined.  (Evid. Code, § 1200, subd. (a) [hearsay is evidence of a statement that was made *other than by a witness while testifying at the hearing*].)  And mother's claim the evidence was inadmissible under Evidence Code section 1101, subdivision (b), is forfeited because she did not object to it on that ground (or any other).  (Evid. Code, § 353, subd. (a).)

Mother asserts that when the great-grandmother reported this alleged abuse to the department before the minors were detained, the complaint was dismissed as unfounded.  This assertion does not help mother at the jurisdiction stage.  Whether the abuse happened was for the juvenile court to decide based on all of the evidence before it at the time of the jurisdiction hearing.

Mother finally cites the arguments of her counsel as evidence that her assault on Aiden did not happen or was insufficient to sustain a charge under section 300, subdivision (a).  But arguments of counsel are not evidence.

In conclusion, mother has failed to support her claim the evidence was insufficient to support jurisdiction under section 300, subdivision (a), as to Aidan.

In light of this conclusion, there is sufficient evidence to support jurisdiction under section 300, subdivision (b).  (*In re Joshua G., supra,* 129 Cal.App.4th at p. 202.)  The evidence that justified jurisdiction under subdivision (a), which requires a showing of actual and nonaccidental physical harm, also justified jurisdiction under subdivision (b), which requires only a showing of the likelihood of physical harm due to the parent's mental illness or substance abuse.

Moreover, the evidence that mother intended to pick up the minors from day care on May 3, 2013, while driving under the influence of methamphetamine was enough by

24

itself to show mother's mental and/or drug problems put the minors at risk. Although mother denied she was using methamphetamine or she was going to pick up the minors from day care, the juvenile court disbelieved her, and we cannot reweigh the court's credibility determination.

## II

### *In-Person Visitation*

Mother contends the juvenile court erred by denying her request for in-person visitation and by delegating to the therapists the decision whether she should receive visitation at all. The court did not err.

If the juvenile court provides reunification services to a parent, it shall also provide visitation as frequently as possible, consistent with the minor's well-being. (§ 361.2, subd. (a)(1).) Unless the court finds visitation would cause detriment to the minor, the court may not suspend or halt visits. (*In re Nicholas B.* (2001) 88 Cal.App.4th 1126, 1138.) The court also may not delegate to therapists the unlimited discretion to decide whether a parent should receive visitation. (*Ibid.*)

But the juvenile court did not suspend or halt visitation, nor did it delegate to the minors' therapists whether visitation could occur. After expressly acknowledging it could not delegate that decision to the therapists, the court continued the existing order granting visitation to mother in the form of cards, letters, and weekly telephone calls, while reasonably refusing to allow in-person visitation until the therapists had given some assurance such visitation would not cause detriment to the minors.

Mother cites no authority holding visitation must be in-person, and we know of no such authority. Absent such authority, her assertion that the visitation she had been receiving was not "meaningful" does not raise a cognizable argument. Mother asserts the juvenile court did not find in-person visitation would be detrimental to the minors. However, the court stated that after getting a report from the therapists it would need to

25

"determine what's in the best interests of these children." In other words, the court impliedly found it was not in the minors' best interests to allow in-person visitation now -- i.e., that it would be detrimental to them. That finding was sufficient.

DISPOSITION

The juvenile court's orders are affirmed.


        HOCH    , J.


We concur:


     BLEASE   , Acting P. J.


     MAURO   , J.